**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | | |
|---|---|---|
| L.J. | § | |
|     Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA; | § | Civil Action No.: 4:26-cv-3845 |
| UNITED STATES OF AMERICA | § | |
| FEDERAL BUREAU OF PRISONS; | § | JURY TRIAL DEMAND |
| FPC BRYAN WARDEN TANISHA HALL, | § | |
| in her individual capacity | § | |
| OFFICER DONALD ROSS, in his individual | § | |
| capacity | § | |
|     Defendants | | |

## COMPLAINT

1.      COMES NOW Plaintiff, L.J., and files this Complaint seeking compensatory relief and punitive damages pursuant to the Federal Tort Claims Act and the Trafficking Victims Protection Act.  In support of such relief, Plaintiff respectfully shows the Court as follows:

## INTRODUCTION

2.      Plaintiff L.J. was sentenced by a judge to 36 months to be rehabilitated by the United States Bureau of Prisons ("BOP"), at the Federal Prison Camp Bryan, in Bryan, Texas ("FPC Bryan").  Instead, L.J. spent almost the entirety of her incarceration at FPC Bryan being groomed, manipulated, and sexually abused by Officer Donald Ross, who acted as her supervisor for her work assignment and sexually harassed and assaulted her while acting in the scope of his employment.  After she released from custody in December 2023 and while on probation, L.J. mentally decompensated and relapsed, leading to an additional sentence in BOP.  She was housed at Federal Correctional Aliceville ("FCI Aliceville") in Aliceville, Alabama from October 2024 until her release from custody on April 13, 2026.  She currently resides in Texas.

3.      Ross's abuse was conducted in an open and apparent manner and was obvious to various agents, servants, and employees of the BOP, who knew of and disregarded Ross's interactions with L.J., and with other incarcerated women, in violation of the Prison Rape Elimination Act ("PREA") and its regulations.

4.      Starting within a month of her arrival at FPC Bryan, Plaintiff was groomed, manipulated, sexually harassed, and ultimately sexually assaulted by Officer Donald Ross while he was acting in the scope of his employment both as a correctional officer and as Plaintiff's supervisor for her BOP-administered work detail.

5.      Officer Ross recruited L.J. to work with him in the education department as a clerk.  He told her he expected full loyalty from her.  He frequently told her about other incarcerated women who did not give him their full loyalty and were transferred or sent to the punitive Special Housing Unit ("SHU").  He bought her food and office supplies.  After she became accustomed to these privileges, he began sexually abusing her and demanding sexual favors in exchange for food.  The abuse escalated, and on a number of occasions, Officer Ross penetrated Plaintiff's mouth with his penis and digitally penetrated Plaintiff's vagina approximately thirty (30) times while she was at FPC Bryan.

6.      Plaintiff was isolated by Officer Ross and feared what could happen if she reported him, especially because he had told her that he and the Warden were friends. She felt she would not be believed and would face retaliation.

7.      In addition to Officer Ross's physical sexual abuse, L.J. has endured emotional anguish, including feelings of intense shame and disgust.  The abuse has affected L.J.'s feelings toward romantic relationships and caused her to relapse after her release from FPC Bryan, during which time Officer Ross was in contact with her.  This relapse led her to violate her probation

and in October 2024 she was re-incarcerated in BOP where she was placed in a higher level of mental health care than her previous term.

8.      Plaintiff brings this suit against Defendant United States of America under the Federal Tort Claims Act ("FTCA") and the Trafficking Victims Protection Act ("TVPA"), in connection with the deficient supervision and custodial care provided to her by personnel including Officer Ross, within the scope of his employment with the BOP.  Plaintiff seeks redress for Defendant's unlawful conduct, which caused her to suffer serious injuries.  Plaintiff also brings claims under the TVPA against Officer Ross and Warden Hall in connection with the same conduct.

## JURISDICTION AND VENUE

9.      This action involves claims arising under federal law.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

10.      Jurisdiction is also proper in this Court under 28 U.S.C. § 1346(b)(1), which grants the district courts exclusive jurisdiction over actions brought under the Federal Tort Claims Act.

11.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1)-(2), (e) and 1402(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district, and at least one defendant resides in this district.  Venue is also proper for the FTCA claims pursuant to 28 U.S.C. § 1402(b), as the acts or omissions giving rise to Plaintiff's claims occurred in FPC Bryan which is located in this District.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

12.      Plaintiff administratively exhausted her claim against the United States by presenting it in writing to the Bureau of Prisons South Central Regional Office (Claim No. TRT-SCR-2025-06982) on May 23, 2025, "within two years after" Officer Ross abused her between

February 2023 and December 2023.  28 U.S.C. §§ 2401(b), 2675(a); 28 C.F.R. §§ 14.2(a), 543.30-32.

13.     As of the date of this filing, BOP has neither accepted nor rejected Plaintiff's claim.  Under 28 U.S.C. § 2675(a), BOP's failure "to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim."  By filing this action, Plaintiff elects to deem BOP's lack of response within six months of the submission of the Claim as the final denial of Plaintiff's Administrative Claim in its entirety.  Therefore, Plaintiff exhausted requisite administrative remedies.

## PARTIES

14.     The Plaintiff, L.J., was at all times relevant here incarcerated in BOP facilities, including FPC Bryan, located at 1100 Ursuline Avenue, Bryan, Texas 77803.  L.J. was released from FPC Bryan in December of 2023 and placed on probation.  In or around July 2024, she was re-arrested for a probation violation and placed in a detention center pending revocation of her probation.  In or around October 2024, she was placed back into BOP custody at the Federal Correctional Institution Aliceville ("FCI Aliceville") in Aliceville, Alabama until her release on April 13, 2026. L.J.  currently resides in Texas.

15.     The Defendant Unites States of America ("United States") is liable for the tortious acts of its employees in accordance with the FTCA and is the appropriate Defendant for Plaintiff's claims under the FTCA.  The United States is a sovereign entity that has waived immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

16.    The BOP is a component of Defendant United States' Department of Justice ("DOJ").  The BOP operates and is in possession and control of FPC Bryan.  FPC Bryan is a minimum security federal prison camp which houses female incarcerated people.

17.    At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for enforcing the rules of the BOP and for ensuring BOP personnel obey the Constitution and laws of the United States.

18.    Defendant Tanisha Hall is the current Warden of FPC Bryan and is sued in her individual capacity.

19.    Defendant Officer Donald Ross was a correctional officer at FPC Bryan during the relevant period and is sued in his individual capacity.  While performing the acts and omissions that Plaintiff alleges in this complaint, Officer Ross was acting within the scope of his official employment, or with the BOP's permission and consent and under color of federal law.

20.    At all times relevant hereto, Defendant United States acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters, including at FPC Bryan, and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Officer Donald Ross.

21.    While acting and failing to act as alleged herein, Defendants had complete custody and total control of Plaintiff.  Plaintiff was dependent upon Defendants for her personal security and necessities.  *See* 18 U.S.C. § 4042(a).

22.    At all times relevant hereto, the BOP employees referenced herein were agents, servants, and employees of Defendant United States, and acted within the scope of their

employment, and were responsible for the day-to-day oversight, supervision, care, custody, and control of incarcerated people confined at FPC Bryan, including Plaintiff.

## FACTUAL ALLEGATIONS

23.    Correctional officers and guards are statutorily precluded from engaging in sexual acts with incarcerated persons, pursuant to 18 U.S.C. § 2243(b).  Incarcerated individuals cannot legally consent to sexual acts with correctional officers and guards.

24.    Despite the clear and unequivocal prohibition on sexual assault and harassment of female incarcerated people by BOP staff, it continues to happen, and BOP has been aware of serious, systemic problems in BOP facilities for decades yet has failed to take action.  The United States Senate's Permanent Subcommittee on Investigations found that between 2012 and 2022, "BOP employees sexually abused female prisoners in at least two-thirds (19 of 29 facilities) of federal prisons that have held women."[1]  The Subcommittee further noted that women are "significantly more likely to be sexually harassed and abused while incarcerated," as compared to men, and that "women with histories of sexual abuse—including women in prisons and jails—are particularly traumatized by subsequent abuse."[2]

25.    In July 2022, a DOJ working group was tasked to address "reported and proven sexual misconduct by Federal Bureau of Prisons ("BOP") employees" by reviewing the DOJ's approach to monitoring and deterring BOP employee sexual misconduct.[3]

---

[1] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 1 (Dec. 13, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf (hereinafter "Senate Report").

[2] *Id.* at 6.

[3] The Principal Associate Deputy Attorney General Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, 1 (Nov. 2, 2022),

26.     The working group noted long-standing, pervasive problems throughout the BOP. The working group learned of long-standing insufficient reporting mechanisms, "flawed investigations,"[4] and examples of "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[5]

27.     The working group also noted the problems created by "blind spots" without cameras in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'"[6]

28.     In October 2022, the DOJ Office of the Inspector General ("OIG") issued a memorandum detailing its concerns over how the BOP had been handling administrative misconduct investigations and prisoner statements relevant to those investigations.[7]

29.     The OIG specifically noted that "[t]he BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates."[8]

30.     The OIG further noted that the BOP's procedures had historically created a problem because "to the extent that the BOP's reluctance to rely on inmate testimony is known

---

https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf.

[4] *Id.* at 17.

[5] *Id.* at 4.

[6] *Id.* at 9.

[7] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[8] *Id.* at 3.

to its employees, this reluctance likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences."[9]

31.    The report explained that the "OIG has serious concerns that that the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations, has a general practice of avoiding calling inmates as witnesses in MSPB [Merit Systems Protection Board] and arbitration proceedings, and, at least in matters involving staff on inmate sexual assault, is effectively requiring significantly more proof than necessary under the applicable preponderance of the evidence standard to sustain misconduct and take disciplinary action against BOP employees."[10]

32.    In sum, "[t]he OIG concluded that this manner of handling misconduct by BOP employees is contrary to federal regulations and BOP policy and creates significant risks for the BOP."[11]

33.    As the United States Senate's Permanent Subcommittee on Investigations put it, "BOP 'staff sexual relations with inmates is always illegal' as there is no 'consent' defense to a violation of 18 U.S.C. § 2243(b)."[12]  "This is because the 'inherently unequal' relationship between BOP employees and prisoners precludes prisoners from having 'the same ability as staff members to consent to a sexual relationship.'"[13] *See also* 28 C.F.R. § 115.6 (defining "sexual

---

[9] *Id.* at 4.

[10] *Id.* at 9.

[11] *Id.*

[12] Senate Report at 7 (quoting Department of Justice, Office of Inspector General, *Deterring Staff Sexual Abuse of Federal Inmates* (Apr. 2005) (oig.justice.gov/sites/default/files/archive/special/0504/index.htm)).

[13] *Id.* (quoting Department of Justice, Office of Inspector General, *Deterring Staff Sexual Abuse of Federal Inmates* (Apr. 2005) (oig.justice.gov/sites/default/files/archive/special/0504/index.htm)).

abuse of an inmate … by a staff member" as including enumerated acts, "with or without consent of the" incarcerated person).[14]

34.     FPC Bryan's Admission and Orientation Handbook ("Handbook") provides that "[s]exual acts or contacts between an individual in BOP custody and a staff member, even when no objections are raised by either party, are always forbidden and illegal."[15]

35.     The Handbook also has an attachment called "Empowering Women: A Guide to Successfully Navigating Your Institution," which contains a section about human trafficking, defining human trafficking as involving "the use of force, fraud, or coercion to obtain some type of labor or commercial sex act."[16]  The Handbook describes the methods used "to lure victims into trafficking situations," including "[v]iolence," "[m]anipulation," "[f]alse promises of well-paying jobs," and "[r]omantic relationships."[17]  It goes on to describe the conditions that make a victim an "easy target," which include "[p]sychological or emotional vulnerability," "[e]conomic hardship," and "[l]ack of a social safety net."[18]  The Handbook recognizes that victims' "fear of their traffickers and/or fear of law enforcement" make human trafficking difficult to report.[19]

36.     Per BOP policy, "[t]ermination shall be the presumptive disciplinary sanction for staff who have engaged in sexual abuse."  BOP Program Statement 5333.01 at 55 (quoting 28 C.F.R. § 115.76(b)).

---

[14] *See also* Bureau of Prisons, Program Statement 5333.01, Sexually Abusive Behavior Prevention and Intervention Program Manual (Mar. 19, 2026), at 10, https://www.bop.gov/policy/progstat/5333_001-1.pdf.

[15] *Sexually Abusive Behavior Prevention and Intervention: Information and How to Report*, FPC Bryan Inmate Admission & Orientation Handbook 7, https://www.bop.gov/locations/institutions/bry/bry_ao_handbook.pdf?v=1.0.1.

[16] *Id.*, Attachment D at 28.

[17] *Id.*

[18] *Id.*

[19] *Id.*

37.     Officer Ross, Warden Hall, the BOP, and the United States owed a duty of care to L.J. and those similarly situated of "safekeeping, care … [and] protection" under 18 U.S.C. § 4042(a)(2), (3), and violated this duty toward L.J.

38.     The Prison Rape Elimination Act ("PREA") of 2003 required the Attorney General to promulgate rules to prevent sexual abuse prison facilities. *See* 34 U.S.C. § 30307.  In 2012, the U.S. Department of Justice issued regulations designed to "prevent, detect, and respond to prison rape."  77 Fed. Reg. 37106 (June 20, 2012) (to be codified at 28 C.F.R. § 115).  These regulations were "immediately binding" on BOP facilities.  *Id*. at 37107.

39.     Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; "prevention, detection, reporting,"  and response to such behavior; "[t]he right of inmates to … be free from retaliation for reporting sexual abuse and sexual harassment"; signs and dynamics of sexual abuse in confinement, and "common reactions of … victims"; and "[h]ow to avoid inappropriate relationships with inmates."  *Id*. § 115.31(a).

40.     The regulations greatly restrict the circumstances whereby officers may view incarcerated people's naked bodies.  Facilities are also required to "implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks."  *Id*. § 115.15(d)

41.     The PREA regulations also require that agencies ensure facilities "develop, document, and make [their] best efforts to comply on a regular basis with a staffing plan that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse."  *Id*. § 115.13(a).  Pursuant to the regulations, "facilities shall take

into consideration" a number of factors related to staffing and video monitoring, including any "findings of inadequacy" from federal investigative agencies and oversight bodies.  *Id*. § 115.13(a)(3)-(4).  They shall also take into consideration any "blind-spots" in the facility or "areas where staff or inmates may be isolated."  *Id*. § 115.13(a)(5).

42.    On January 22, 2026, ranking members of the House Judiciary Committee sent a letter to then-Attorney General Pamela Bondi about the rampant misconduct at FPC Bryan, requesting an investigation into reports of sexual abuse that are "numerous, detailed, and substantiated."[20]  The letter described abuse that was reported to have been "tolerated, encouraged, and even engaged in" by senior staff at the prison.[21]  The letter also explained that many people were discouraged, either directly or indirectly, from reporting their abuse for fear of retaliation through transfers and solitary housing placements.[22]  The letter alleged that the Warden, Tanisha Hall, knew about and tolerated sexual abuse and retaliated against staff and incarcerated people who reported misconduct.[23]  The letter included multiple reports that incarcerated women were transferred to higher security prisons farther from their family after reporting staff sexual abuse.[24]  The House Judiciary Committee's ranking members also wrote to the Office of Inspector General, requesting an immediate "criminal investigation into the

---

[20] Letter from the Honorable Jamie Raskin & the Honorable Robert Garcia to Attorney General Pamela Bondi (Jan. 22, 2026), at 4, https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2026-01-22-raskin-rgarcia-to-bondi-doj-re-fpc-bryan.pdf.
[21] *Id.* at 3.
[22] *Id.* at 4-6.
[23] *Id.*
[24] *Id.*

reported staff misconduct at FPC Bryan, including but not limited to violations of 18 U.S. Code § 2243(c) (criminalizing sexual abuse of an individual in federal detention)."[25]

43.    L.J. arrived at FPC Bryan in December 2022 to serve a 36-month sentence.  Per BOP rules, all incarcerated individuals are generally required to work.[26]  When she came into FPC Bryan, L.J. had to do several things to orient herself and get signed up for programs and work.  As part of that, she had to attend an intake interview with FPC Bryan's Education Department, which is where she first met Officer Ross.  During that interview, which was supposed to be to assess her level of education in order to place her in classes, Officer Ross asked her "do you want a job?" She said yes, but she was not sure if he was serious.  Plaintiff now believes that Officer Ross used intake interviews as a way to get to know certain incarcerated women he was interested in.  During L.J.'s intake interview, Ross had L.J.'s Presentence Investigation Report ("PSIR") pulled up, and was asking her questions about her charge.

44.    A few weeks later, in January 2023, L.J. was walking outside on the compound during her recreation time when Officer Ross drove up next to her on a golf cart and asked if she still wanted a job.  When she responded yes, he told her to get into the golf cart, which she did.

45.    L.J. had yet to complete Admission & Orientation ("A&O"), after which point she would be allowed to work.  Officer Ross told her she could not officially work for him until

---

[25] Letter from the Honorable Jamie Raskin & the Honorable Robert Garcia to Acting Inspector General Don R. Berthiaume (Jan. 22, 2026), at 1, https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2026-01-22-raskin-rgarcia-to-berthiaume-doj-oig-re-fpc-bryan.pdf.
[26] *See* FPC Bryan Inmate Admission & Orientation Handbook 18, https://www.bop.gov/locations/institutions/bry/bry_ao_handbook.pdf?v=1.0.1.

she completed A&O, so he told her not to tell anyone.  During the time after she was hired and before completing A&O, she went to the library in the education building and learned Spanish.

46.    L.J. officially began working under Officer Ross's supervision in the Education Department as a clerk later in or around January 2023.  Upon information and belief, Ross was a Supervising Education Officer, second in command.  As a clerk, L.J.'s role was to help with signing people up for classes, preparing classrooms, assisting with Officer Ross's calendar, making copies, going through the mail, and doing anything else Officer Ross asked her to do.

47.    As soon as she started working in the Education Department, Officer Ross told her that he demanded her loyalty.  He told L.J. that if she wanted to work under his supervision, she had to be 100% loyal to him.  He told her that eventually she would be able to look at his facial expression and know exactly what he was thinking.  At first, she did not know what Officer Ross meant by her full loyalty but tried to do what he wanted because she was afraid of what he would do if she did not.

48.    She was also afraid to say anything to anyone because he told her that he should never hear anything about him from someone else, and reminded L.J. that he could listen to her phone calls, read her emails, and watch her video visits.

49.    She knew this was true because Officer Ross would call L.J. into his office and show her the video visits.  She had once seen Officer Ross watching another incarcerated person's video visit once where the person was showing her body to the other person on the call.  He did not randomly choose video visits to monitor; he watched the same few incarcerated women's videos for his own gratification.  Upon information and belief, Officer Ross did not give an incident report to any of these individuals.  BOP officials were or should have been

aware that Officer Ross was doing this. Officer Ross also told L.J. that the institution can track how many videos he watches, so he was careful not to watch too many.

50.     When Officer Ross told L.J. she should be able to read his facial expressions, at first she did not know what he meant. However, the longer she worked for him, the more she realized what it meant. After Officer Ross would conduct intake interviews of incarcerated women in his office, he would look at the incarcerated woman, look at L.J., and either raise his eyebrows or grin, and L.J. could tell what he thought of the incarcerated person. After the interviews, Officer Ross would call L.J. into his office and ask L.J. to tell him what she suspected he liked about the woman, such as her butt or her breasts. Officer Ross would then respond to tell her whether she was right. This happened at least every other week. If he was attracted to an incarcerated woman he interviewed, he would get her added to classes sooner than other people.

51.     L.J. wanted the job at education, because the job meant she got her own desk and access to supplies such as glitter pens and a sewing machine, both of which she could not have gotten otherwise, so she agreed to do what Officer Ross asked her to do. In exchange for her loyalty, Officer Ross brought L.J. food from outside the prison or from staff parties. He would buy her huge packs of colorful pens, and she would have access to a sewing machine to alter her clothing. She also was able to make phone calls from the staff phones in education, which meant she did not have to worry about using minutes she had to pay for, waiting in long lines, or talking on a monitored line. Given that she did not have money on her account and the restrictive setting of prison, these were all significant benefits to L.J.

52.     Officer Ross also placed L.J. in classes ahead of people on waitlists and even enrolled her in community college the day she started working for him. As soon as that course

ended, Officer Ross immediately enrolled her in another course before he told other incarcerated people it was available.  This made her feel as if he cared for her and was looking out for her.

53.    L.J. began getting close to Officer Ross right after she started working for him. He would tell her intimate details about his life, including his relationships and sexual life.  He told her he was married, how many children he had, and about his trips to massage parlors and strip clubs.

54.    L.J. now realizes that Officer Ross was testing the limits of her loyalty before he touched her physically.  Before he ever touched her, Officer Ross would call her into his office and say, "I'm getting too close to you," while grabbing his groin outside of his pants.  L.J. would tell him "so stop," but did not say anything more because she did not want to lose her job.  This happened at least five times in the beginning of her time working in education.  Officer Ross usually said it while doing something inappropriate, such as grabbing his groin or showing her that he was erect.  She believes that Officer Ross was testing to see if she would tell on him for his behavior.

55.    L.J. noticed that Officer Ross tested other of his employees' loyalty too.  Officer Ross specifically told L.J. that he had touched one of the other education worker's breasts to test her to see if she would go and tell on him.  She did end up reporting him, so Officer Ross told L.J. to be mean to her and to not give her any supplies.  L.J. knew what happened when a woman reported him for his behavior because she had seen people go to SHU and be transferred out of the facility after reporting.

56.    Sometime around March 2023, L.J. was in the education building on one of Officer Ross's late night shifts.  Because it was after hours, she was allowed to wear gym shorts and a T-shirt instead of her regular uniform.  Officer Ross told her he brought her a barbecue

sandwich and placed it in the utility closet for her to eat.  She went into the closet to eat the sandwich.  While she was mid-bite and facing away from the door, Officer Ross came up behind her, slid his hands under her shirt and bra, and groped her breasts under her clothing for about a minute.

57.     She was caught by surprise by his assault and was in shock.  She lost her appetite and stopped eating.  After he groped her, Officer Ross walked out of the closet and back into his office.  L.J. was nervous and did not know what to do, or what else Officer Ross was going to do to her now that he had touched her.

58.     L.J. went back to her desk, and Officer Ross called her into his office.  He asked her if she was going to tell on him for what he did in the closet, and she said no.  He repeatedly asked her, and she repeatedly assured him she would not tell on him.  Officer Ross reminded her that he had to be able to trust her.

59.     L.J. did not report Officer Ross after that incident.  She knew what she had to lose—all of the special privileges he had provided her—but she also knew that she could face more serious consequences.  She had heard about other incarcerated women who had reported staff sexual abuse.  In response to their reports, those women were placed in the Special Housing Unit ("SHU"), BOP's punitive housing unit, where they had limited access to phones, email, out-of-cell time, and commissary, and were transferred out to a different facility.  L.J. had heard of women going to FCI Aliceville in retaliation for reporting.  She heard that FCI Aliceville had limited programming.  At FPC Bryan, L.J. was taking classes for college credit and enrolled in an HVAC program which provided her real-life work experience.  L.J. was fearful of being transferred to FCI Aliceville and losing these opportunities.

60.    In addition to L.J. hearing about other women who had been transferred out in retaliation, Officer Ross would inform L.J. whenever an incarcerated person reported an allegation and was placed in the SHU.  This happened at least three times.  He would show her the individual's file on his computer, showing their SHU placement.  Officer Ross would also show her when individuals were transferred to FCI Aliceville's camp, which was known as an inferior camp for programming.  She felt like this was a reminder from Officer Ross that she would face a similar fate if she reported his abuse.

61.    Officer Ross also told her about the officers who were accused.  He told her that they were under investigation, but they were on paid leave.

62.    After L.J. did not report Officer Ross's assault of her in March 2023, the abuse progressed.  Even though he used to bring her food without expectation of sexual favors, after the March incident, every time she asked Officer Ross for food, he would ask if she was going to let him touch her again.  This made her feel cheap, but she acquiesced and would let him touch her again whenever he asked.

63.    Around April 2023, Ross started coming up behind L.J. and pushing his groin up against her backside.  One day when he did this, he told her, "Go ahead you can touch it," referring to his penis.  L.J. complied and reached back and started touching his penis.

64.    The abuse continued to escalate after April 2023.  Officer Ross would request that L.J. touch his penis while he touched her genitals.  He also requested that she perform oral sex on him.  When he ejaculated, he would use the paper towels and regular towels in the storage closet to clean himself off. L.J. remembers there were always towels there because the roof would leak.

65.    From April 2023 through December 2023, Officer Ross sexually abused L.J. multiple times a week.  At least twice a week, Officer Ross would grope her, rub against her, ask her to show him her breasts, and request that she touch him outside his pants.  At least once a week, Officer Ross digitally penetrated L.J.'s genitals and/or instructed her to perform oral sex on him.  Officer Ross penetrated Plaintiff's mouth with his penis and digitally penetrated Plaintiff's vagina approximately thirty (30) times while she was at FPC Bryan.

66.    L.J. felt repulsed by the sexual abuse.  She had been in a relationship with her child's father for about fourteen years, and he was the only person she had wanted to be with.  Officer Ross took that away from her, and she struggled to accept that this was something she could not get back.  L.J. also struggled with having to keep the abuse a secret because Officer Ross had isolated her from other staff and incarcerated people.  He frequently told her, "You have no friends in prison," and that she could not trust anyone. Officer Ross had manipulated and groomed her into thinking he was the only one she could trust, so she did not know where to turn when he abused her.

67.    Throughout the sexual abuse, Officer Ross continued to remind L.J. of the consequences she would face if she reported him.  Every once in a while he would tell her that they were getting too close and he may need to find someone to replace her.  Officer Ross knew that L.J. was vulnerable, not only because of her status as an incarcerated person, but because he knew that she depended on the privileges he provided her.  He once told her that he would not "try anything" with another incarcerated woman because that woman came from money and her husband had a private jet.  This made L.J. feel like Officer Ross preyed on her vulnerability to abuse her.

68.     When Officer Ross would threaten to fire her, L.J. would reassure him she would not say anything and that she needed to keep the job.  Sometimes he would yell out to the classroom, "Who needs a job?" which would make her feel embarrassed and like she had to prove her loyalty further.

69.     L.J. is aware of three incarcerated women Officer Ross sexually abused while she was working for him, but she believes there are likely more.  Officer Ross told her about an incarcerated woman he used to be involved with before L.J. joined education.

70.     L.J. also saw Officer Ross act inappropriately with non-incarcerated women as well.  There was a female officer who worked in the mail room who he was attracted to, and he would go to a specific classroom to look out the window to see when she arrived to the mail room.  Officer Ross also had an inappropriate relationship with the woman he would order supplies from.  L.J. heard him conduct personal phone calls with her.  Once, when L.J. suggested they order from someone else because some supplies were missing, Officer Ross told her he did not want to order from some "random man."

71.     Because Officer Ross had isolated L.J. and demanded her full loyalty, she knew she was expected to help Officer Ross abuse other incarcerated women, and that there would be consequences for refusing to do so.

72.     In approximately June 2023, Officer Ross began bringing another incarcerated person into his office and giving L.J. a look, and L.J. knew that she was expected to act as a look-out for Officer Ross so he would not get caught with the incarcerated person.  L.J. knew that Officer Ross had been sexually abusing this individual, and she had previously seen them kissing.

73.     Officer Ross also expected L.J. to report to him anything she had heard about his misconduct around the compound.  Every Monday when she came to work, he would ask her what she heard about him over the weekend.

74.     Fearing she could be replaced in her job, L.J. began to feel protective of her role and to feel jealous when Officer Ross would talk about this attraction to other incarcerated women.  She once heard him say he wanted to leave his wife for one of them.

75.     When a new education worker joined, she asked L.J. if there was anything going on with Officer Ross.  Because of her fear of reporting him, she denied it.  At that time, she had heard that other people had reported Officer Ross, but she remained too nervous to do so.

76.     All of the abuse happened in closets in the education building, which is separate from the rest of the compound.  The majority of the abuse happened in the GED room, which L.J. understood to be rarely used and only for GED testing.  Upon information and belief, there were no cameras in the education building.  L.J. had seen cameras in the housing unit and had noticed they were absent from the education building and virtually every other area of the prison.  L.J. often worked late in education, especially on Tuesday nights when Officer Ross worked his late shift.

77.     Much of the abuse happened on these nights.  L.J. was the only clerk in education at the time.  The education building could be locked from both the front and the side doors, and during Officer Ross's late shifts, he would unlock the door to let her in, lock it after she came in on a number of occasions and then digitally penetrated her genitals and penetrated her mouth with his penis.

78.     L.J. believes that other officers were aware that something inappropriate was going on, because they would see her there working late, and because other incarcerated women had reported Officer Ross's abuse.

79.     L.J.'s fears of retaliation if she reported Officer Ross were heightened by the fact that he told her that he was friends with Warden Hall, and that their children played on the same sports teams.  Over the time period that he was abusing her, Officer Ross would frequently tell her that he is protected and Warden Hall has his back.  L.J. also saw Officer Ross and Warden Hall interact and observed that they were very friendly with one another.

80.     L.J. eventually completed her sentence and was released from FPC Bryan in December of 2023.  After she was released, Officer Ross had her phone number and started calling her.  He would ask her to come stay with him while his wife was out of town.  He reminded her to not tell anyone he was calling her.   He also texted her.  The calls and texts continued for about five months.  L.J. did answer his calls and texts but she never went to see him.  She had been very confused about how she had felt about Officer Ross.  She did not like that he continued to insist on her silence.  He would tell her even after she was released, "Don't tell anyone about these calls. Don't tell your family."

81.     After she was released, L.J. did not report the abuse because had not realized how wrong Officer Ross's behavior was.  Because she had been provided perks by Officer Ross in exchange for sexual favors, she had been conditioned to believe that she owed him.  It was not until she was re-incarcerated at Aliceville and had distance from Officer Ross that she began to realize all the ways Officer Ross had manipulated her and how abusive and wrong his behavior had been.

82.    During the time after L.J. was released and while Officer Ross continued to harass her, prior to her re-incarceration, she relapsed on substances.  L.J. was not rehabilitated in the BOP, and in fact was abused and traumatized during her incarceration and continued to be harassed by Officer Ross after her release.  L.J. felt so much shame and disgust because of the abuse she had experienced, which caused her to engage in self-destructive behavior as a means of coping with her abuse in prison.  She also had not been adequately prepared for her release.  After her release, L.J. was also mentally struggling too much to keep a job.  This relapse contributed to her revocation of probation, which caused her to return to BOP to serve an additional seven months at FCI Aliceville, where she was housed until her release on April 13, 2026.

83.    After L.J. was arrested and believed she may be re-incarcerated, she texted Officer Ross to ask him if he saw her name back in the system.  He replied to tell her he did not see her name.

84.    While L.J. was in a holding center waiting to be sent to FCI Aliceville, someone from BOP reached out to L.J.'s mom to speak to L.J.  When she arrived at FCI Aliceville in or around October 2024, a Special Investigative Agent ("SIA") came to speak with her about Officer Ross.  L.J. had not reported anything about Officer Ross, but the SIA told her that someone had reported his abuse on her behalf.  She does not know who reported the abuse.

85.    When L.J. arrived at FCI Aliceville in October 2024, during her intake, mental health staff recognized her mental health decompensation and increased her mental health level of care.  She was later diagnosed with major depressive disorder and prescribed psychiatric medication.

86.     In March 2026, after almost a year after L.J. filed her administrative tort claim to BOP and about a year and a half since SIA first spoke with her, SIA Alvarado came to speak with her at FCI Aliceville.  L.J. was placed in a room with an officer and she felt pressured to speak with SIA Alvarado.  Even after L.J. said that she has an attorney, the SIA told her that she understood but that BOP had gotten her tort claim (submitted by her attorneys in this matter) and wanted to speak with her about it.  L.J. felt very uncomfortable.  Because she had already spoken with SIA before and her requests to involve her attorneys were ignored, she was concerned that the interview was retaliatory and an effort to coerce her into recanting her allegation.

87.     Officer Ross's abuse has caused significant harm to L.J.  As a result of Officer Ross's egregious abusive conduct, L.J. has suffered from the physical sexual assaults themselves and will continue to suffer grievous personal injuries including but not limited to: loss of sleep, headaches, extreme emotional trauma; mental anguish and resulting physical symptoms; fear for personal safety; anxiety; depression; humiliation; and loss of enjoyment of life.

88.     L.J. was in a long-term relationship at the time of the abuse, and she felt like Officer Ross took something from her that was sacred which she cannot get back.  His abuse made her feel dirty, embarrassed, and ashamed, and impacts her ability to have a healthy relationship after she released from FPC Bryan.

89.      L.J. avoids talking about the trauma she experienced at FPC Bryan, because she feels like she is reliving it when she does so.  She feels ashamed and used every time she thinks about what happened.  Even though she reported the abuse at FCI Aliceville, she was not provided with any outside counseling.  While she was at FCI Aliceville, she felt trapped and like she had no outlet, and she continues to suffer serious harm from the assaults and resulting physical and emotional injuries.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Against Defendant United States of America

### (Assault Under Federal Tort Claims Act, Texas Common Law)

90.     Plaintiff L.J. incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

91.     Plaintiff brings this claim against the United States under the FTCA based on wrongful acts and/or omissions by Officer Ross, while acting within the scope of his employment as a federal correctional officer for the Bureau of Prisons.

92.     The above-described acts and omissions of Officer Ross and other BOP personnel constitute the tort of assault under the laws of the State of Texas.

93.     Plaintiff's injuries were caused, in whole or in part, by intentional torts, *i.e.*, assault and battery, perpetrated by Officer Ross.  Under 28 U.S.C. § 2680(h), Defendant United States is liable for intentional torts perpetrated by its agents who are law enforcement officers, including correctional officers like Officer Ross, that occurred within the scope of their employment or under color of federal law, as here.

94.     As an incarcerated person, it was impossible for Plaintiff to provide consent to a sexual act with Officer Ross, under 18 U.S.C. § 2243(b).

95.     When Officer Ross groped Plaintiff, digitally penetrated her vagina, and penetrated her mouth, he knew or should have known Plaintiff did not—and could not—consent for a sexual encounter and that any such interaction would be sexual assault.

96.     A person is liable for assault if that person intentionally or knowingly threatens another with imminent bodily injury.  A threat may be by conduct or by words.

97.    Officer Ross intentionally, knowingly, or recklessly threatened L.J. with bodily injury to L.J. when he repeatedly groped her breast, touched her genitals, forced L.J. to touch his penis until he ejaculated, and forced L.J. to perform oral sex on him.

98.    L.J. was in frequent apprehension of bodily injury and harmful and offensive bodily contact due to the weekly sexual abuse by Officer Ross.

99.    Officer Ross acted within the scope of his employment when he abused L.J. Officer Ross worked as a correctional officer in the education department.  In this position in the BOP, he was responsible for supervising the incarcerated individuals, including L.J., who worked in education.  He was also responsible for coordinating incarcerated individuals' participation in classes and managing the waitlist for those classes.  In exchange for sexual favors by L.J., Officer Ross enrolled her in classes that had long waitlists.  He also allowed her to use the education office phone to call her family.  Officer Ross also brought L.J. food and office supplies through his position and asked for sexual favors in return.  All of the abuse happened in the education building, an area where the BOP failed to install cameras.  Officer Ross used his position as L.J.'s supervisor to abuse her and prevent her from reporting the abuse.  On a number of occasions, Officer Ross indicated to L.J. that he would have to replace her in her job unless she proved her loyalty to him.

100.    Officer Ross's digital penetration of Plaintiff's vagina and his penetration of his penis into Plaintiff's mouth constituted the commission of a sexual act.  42 U.S.C. § 1997e(e).

101.    Pursuant to the FTCA, Plaintiffs are entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

## SECOND CLAIM FOR RELIEF

### Against Defendant United States of America

### (Battery Under Federal Tort Claims Act, Texas Common Law)

102.   Plaintiff L.J. incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

103.   Plaintiff brings this claim against the United States under the FTCA based on wrongful acts and/or omissions by Officer Ross, while acting within the scope of his employment as a federal correctional officer for the Bureau of Prisons.

104.   The above-described acts and omissions of Officer Ross and other BOP personnel constitute the tort of battery under the laws of the State of Texas.

105.   Plaintiff's injuries were caused, in whole or in part, by intentional torts, perpetrated by Officer Ross.  Under 28 U.S.C. § 2680(h), Defendant United States is liable for intentional torts perpetrated by its agents who are law enforcement officers, including correctional officers like Officer Ross, that occurred within the scope of their employment or under color of federal law, as here.

106.   As an incarcerated person, it was impossible for Plaintiff to provide consent to a sexual act with Officer Ross, under 18 U.S.C. § 2243(b).

107.   When Officer Ross groped Plaintiff, digitally penetrated her vagina, and penetrated her mouth, he knew or should have known Plaintiff did not—and could not—consent for a sexual encounter and that any such interaction would be sexual battery.

108.   A person is liable for battery if that person:

- intentionally, knowingly, or recklessly causes bodily injury to another; or

- intentionally or knowingly causes physical contact with another when he or she knows or should reasonably believe that the other will regard the contact as offensive or provocative.

109.    Officer Ross intentionally, knowingly, or recklessly caused bodily injury to L.J. when he groped her breast, touched her genitals, forced L.J. to touch his penis until he ejaculated, and forced L.J. to perform oral sex on him.

110.    Officer Ross intentionally or knowingly caused physical contact with L.J. that he knew or should have reasonably believed L.J. would regard the contact as offensive or provocative.  He did this when he groped her breast, touched her genitals, forced L.J. to touch his penis until he ejaculated, and forced L.J. to perform oral sex on him.  Officer Ross knew, or should have known, that sexual contact with an incarcerated individual in his control was not only offensive or provocative, but also illegal.

111.    Officer Ross acted within the scope of his employment when he abused L.J. Officer Ross worked as a correctional officer in the education department.  In this position in the BOP, he was responsible for supervising the incarcerated individuals, including L.J., who worked in education.  He was also responsible for coordinating incarcerated individuals' participation in classes and managing the waitlist for those classes.  In exchange for sexual favors by L.J., Officer Ross enrolled her in classes that had long waitlists.  He also allowed her to use the education office phone to call her family.  Officer Ross also brought L.J. food and office supplies through his position and asked for sexual favors in return.  All of the abuse happened in the education building, an area where the BOP failed to install cameras.  Officer Ross used his position as L.J.'s supervisor to abuse her and prevent her from reporting the abuse.  On a number of occasions, Officer Ross indicated to L.J. that he would have to replace her in her job unless she proved her loyalty to him.

112.        Officer Ross's digital penetration of Plaintiff's vagina and his penetration of his penis into Plaintiff's mouth constituted the commission of a sexual act.  42 U.S.C. § 1997e(e).

113.        Pursuant to the FTCA, Plaintiffs are entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

**THIRD CLAIM FOR RELIEF**

**Against Defendant United States of America**

**(Negligence Under Federal Tort Claims Act, Texas Common Law)**

114.        Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

115.        Plaintiff brings this claim against the United States under the FTCA based on wrongful acts and/or omissions by Officer Ross while acting within the scope of his employment as a federal correctional officer for the Bureau of Prisons.

116.        The above-described acts and omissions of Officer Ross, other BOP personnel, and Defendant United States constitute the tort of negligence under the laws of the State of Texas.

117.        **Duty.** "[T]he duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule." *United States v. Muniz*, 374 U.S. 150, 164-65 (1963).  Pursuant to 18 U.S.C. § 4042, the United States owes a duty to incarcerated people in BOP to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States."  18 U.S.C. § 4042(a)(2), (3).  Defendant United

States was also statutorily obligated under the Prison Rape Elimination Act and under BOP policy to protect prisoners from foreseeable harm that included the sexual abuse suffered by L.J.

118.    Further, under Texas state law, prison officials owe a duty of reasonable care to protect incarcerated people from harm when that harm is reasonably foreseeable.

119.    **Breach of duty.**  Officer Ross, acting within the scope of his employment as an employee of Defendant United States, failed to perform his duty to protect Plaintiff from injury by sexually abusing her.  Defendant United States failed to adequately provide for the safekeeping and protection of Plaintiff by placing her under the care of Officer Ross.  Defendant also failed to adequately staff and monitor the facility in areas where staff may be alone with incarcerated people.

120.    Defendant United States of America had knowledge of the threat of future sexual abuse posed to prisoners as committed by facility staff throughout the BOP, through the above-mentioned Congressional investigation and other government investigations referenced therein.

121.    Defendant United States of America also had knowledge that employees are aware of which areas of facilities are not captured by video surveillance, and that they use this knowledge to be alone with and abuse female prisoners and to escape detection.

122.     Defendant United States of America's knowledge of prior sexual abuse at multiple BOP facilities placed it on notice of employees' propensity to engage in sexually abusive behavior with prisoners such as Plaintiff.

123.    Upon information and belief, the United States knew or should have known that Officer Ross was sexually inappropriate with incarcerated women and had previously been accused of sexually abusing at least one other incarcerated woman.

124.   **Causation.** Plaintiff suffered injuries proximately caused by Defendant's failure to exercise the duty of care.  It was foreseeable that Officer Ross's sexual abuse would cause the harm suffered by Plaintiff.

125.   Plaintiff's injuries include physical harm directly caused by Officer Ross groping her, touching her genitals including digitally penetrating her, forcing her to touch his penis until he ejaculated, and forcing her to perform oral sex on him.

126.   Plaintiff's injuries also include emotional anguish, including feelings of intense shame and difficulty forming and maintaining relationships.  Officer Ross's sexual abuse of L.J. until her release from FPC Bryan also proximately caused her to relapse and return to BOP requiring a higher level of mental health care.

127.   Officer Ross's digital penetration of Plaintiff's vagina and his penetration of his penis into Plaintiff's mouth constituted the commission of a sexual act.  42 U.S.C. § 1997e(e).

128.   Pursuant to the FTCA, Plaintiffs are entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

**FOURTH CLAIM FOR RELIEF**

**Against Defendant United States of America**

**(Intentional Infliction of Emotional Distress under Federal Tort Claims Act, Texas Common Law)**

129.   Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

130.   Plaintiff brings this claim against the United States under the FTCA based on wrongful acts and/or omissions by Officer Ross, while acting within the scope of his employment as a federal correctional officer for the Bureau of Prisons.

131.    The above-described acts and omissions of Officer Ross, other BOP personnel, and Defendant United States constitute the tort of intentional infliction of emotional distress under the laws of the State of Texas.

132.    A person is liable for intentional infliction of emotional distress if the plaintiff can show: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.  *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003).

133.    Officer Ross, acting within the scope of his employment, acted intentionally and recklessly when he broke the law by soliciting and engaging in sexual acts with L.J., despite his duty to protect her from harm and the inherent imbalance of power and control between him and L.J.

134.    Such conduct was extreme and outrageous.  Officer Ross manipulated, groomed, and isolated L.J. in order to sexually abuse her.  Officer Ross sexually harassed and assaulted L.J. at his place of employment, despite the fact that she could not consent because she was an incarcerated person and he was an officer charged with her safekeeping.  Because of the restrictions in custody, Officer Ross, and others employed by Defendant United States, had control over many of Plaintiff's activities.  Officer Ross used his position of trust and safekeeping to sexually abuse her.

135.    L.J. has been directly harmed by Officer Ross's conduct acting within the scope of his employment as an employee of Defendant United States.  This emotional distress is severe.  L.J. now experiences anxiety and emotional distress because of Officer Ross's abuse. She feels ashamed and disgusted, especially because at the time of the abuse, L.J. was in a long-

term relationship, and she felt like Officer Ross took something from her that was sacred which she cannot get back. The abuse has affected L.J.'s ability to form and maintain relationships, and caused her to relapse and return to BOP requiring a higher level of mental health care.

136. Under 28 U.S.C. § 2680(h), Defendant United States is liable for intentional torts perpetrated by its agents who are law enforcement officers, including correctional officers like Officer Ross, that occurred within the scope of their employment or under color of federal law, as here.

137. Officer Ross's digital penetration of Plaintiff's vagina and his penetration of his penis into Plaintiff's mouth constituted the commission of a sexual act. 42 U.S.C. § 1997e(e).

138. Pursuant to the FTCA, Plaintiffs are entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

**FIFTH CLAIM FOR RELIEF**

**Against Defendant United States of America**

**(Negligent Hiring and Supervision under Federal Tort Claims Act, Texas Common Law)**

139. Plaintiff incorporates by reference every allegation in the preceding paragraphs as if fully set forth herein.

140. The above-described acts and omissions of Officer Ross, other BOP personnel, and Defendant United States constitute the tort of negligent hiring and supervision under the laws of the State of Texas.

141. An employer is liable for negligent hiring and supervision when they are negligent in hiring or supervising the employee, and the employee committed an actionable tort against the plaintiff.

142.    Defendant United States of America hired Officer Ross and allowed him to use his position of power within the facility to exert influence over incarcerated people such as Plaintiff.

143.    Defendant United States of America knew that potential abusers such as Officer Ross would have the opportunity to be alone with female prisoners, particularly in secluded areas and areas without other facility personnel or video surveillance.  Officer Ross was the officer in charge of L.J. as an education clerk.

144.    Defendant United States of America failed to properly oversee and administer FPC Bryan, and failed to properly implement BOP and PREA policies that would have deterred sexual abuse, such as that suffered by Plaintiff.

145.    Defendant United States of America had knowledge of the threat of future sexual abuse posed to prisoners as committed by facility staff throughout the BOP, through the above-mentioned Congressional investigation and other government investigations referenced therein.

146.    Defendant United States of America also had knowledge that employees are aware of which areas of facilities are not captured by video surveillance, and that they use this knowledge to be alone with and abuse female prisoners and to escape detection.

147.     Defendant United States of America's knowledge of prior sexual abuse at multiple BOP facilities placed it on notice of employees' propensity to engage in sexually abusive behavior with prisoners such as Plaintiff.

148.    Upon information and belief, the United States knew or should have known that Officer Ross was sexually inappropriate with incarcerated women and had previously been accused of sexually abusing at least one other incarcerated woman.

149.     If Defendant United States of America had properly supervised employees, facility staff such as Officer Ross would not have been able to sexually abuse prisoners.

150.     If Defendant United States of America had conducted thorough investigations of reported employees, Officer Ross would not have been able to continue sexually abusing prisoners, including Plaintiff.

151.     On information and belief, Defendant United States of America was also negligent in allowing employees who it knew had previously committed sexual abuse to continue to safeguard and monitor a female population of prisoners.

152.     If Defendant United States of America had properly supervised and investigated employees such as Officer Ross, it would have learned of his propensity to commit sexual abuse.

153.     As detailed above, Officer Ross committed actionable torts against the Plaintiff, including assault, battery, intentional infliction of emotional distress, and negligence.

154.     As detailed above, the sexual abuse suffered by Plaintiff constituted the commission of a sexual act.  42 U.S.C. § 1997e(e).

155.     Defendant United States of America's above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

### CLAIMS FOR RELIEF UNDER THE TVPA

156.     Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

157.     The exploitation of vulnerable people is so common that Congress has passed the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1581 *et. seq*., a comprehensive statutory framework imposing both criminal and civil liability, *see* 18 U.S.C. § 1595, of persons engaging or attempting to engage or benefit from sexual exploitation and labor trafficking or obstructing anti-trafficking enforcement.

158.     Specifically, the TVPA punishes anyone who attempts to, conspires to, or actively "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or … benefits, financially or by receiving anything of value, from participation in a [trafficking] venture" while knowing "that means of force, threats of force, fraud, coercion … will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a); 18 U.S.C. § 1594.

159.     "Coercion" means "threats of serious harm to or physical restraint against any person … any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person," or "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2).

160.     "Serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

161.     "The term 'abuse or threatened abuse of law or legal process' means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1591(e)(1).

162.     "The term 'commercial sex act' means any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

163.    Additionally, the TVPA punishes anyone who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means: (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a).

164.    The TVPA punishes anyone who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means." 18 U.S.C. § 1589(b).

165.    The term "abuse or threatened abuse of law or legal process" in the forced labor provision "means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  18 U.S.C. § 1589(c)(1).

166.    The term "serious harm" in the forced labor section "means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589 (c)(2).

167.　　The TVPA also punishes anyone who "obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section." 18 U.S.C. § 1591(d).

168.　　The TVPA allows "[a]n individual who is a victim of a violation of this chapter [to] bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." 18 U.S.C. § 1595(a).

169.　　Congress grants a plaintiff up to ten years in which to bring a civil action under 18 U.S.C. § 1595(c).

170.　　Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

## SIXTH CLAIM FOR RELIEF

### Against Defendants Officer Ross and Warden Hall

### (Sex Trafficking – TVPA)

171.　　Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

172.　　Defendant Officer Ross engaged or attempted to engage in sex trafficking of Plaintiff L.J. as prohibited under 18 U.S.C. § 1591; § 1594(a).

173.　　Defendant Officer Ross coerced L.J. to engage in commercial sex acts within the meaning of 18 U.S.C. § 1591. These sex acts included groping her over and under the clothes, digitally penetrating her genitals, coercing her to touch his penis until he ejaculated, and coercing her to perform oral sex on him.

174.    Defendant Officer Ross knowingly recruited, enticed, and solicited Plaintiff L.J. by making repeated romantic overtures, and harassing her, and offering special benefits and things of value for sex acts.

175.    Defendant Officer Ross made Plaintiff L.J. commit these sexual acts through force, fraud, or coercion within the meaning of 18 U.S.C. § 1591.  He did so by:

- Using physical force to grab L.J. and grope her body and digitally penetrating her;

- Assaulting her in locations where she could not easily escape;

- Using his power and status as a correctional officer and work supervisor who has the power to control and direct incarcerated persons and their movements to have L.J. engage in commercial sexual acts with him, such as penetrating her mouth with his penis;

- Threatening her with loss of privileges and her job if she did not comply

176.    These methods of force, fraud, and coercion were a plan designed to make Plaintiff L.J.  believe that she would suffer serious harm should she not obey his sexual advances.

177.    Defendant Officer Ross exchanged valuable goods and special benefits for these sex acts.  In this way, Defendant Officer Ross's conduct constitutes an attempt to engage in sex in exchange for things of value, the definition of commerciality under 18 U.S.C. § 1591.

178.    These tactics are part of a well-known scheme, plan, or pattern at FPC Bryan by a network of officers and the Warden that were intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint.

179.    Defendant Warden Tanisha Hall engaged or attempted to engage in sex trafficking of Plaintiff L.J. as prohibited under 18 U.S.C. § 1591; § 1594(a).

180.    Defendant Hall, as Warden of FPC Bryan, knew or should have known, and recklessly disregarded the fact that Officer Ross had engaged in commercial sex acts with the

[4811491.12]

Plaintiff in violation of the TVPA. By her acts and omissions in enabling this abuse, Defendant Hall benefitted through continued employment when she, through her own actions and those she directed in her office, ignored the conditions that led to Officer Ross's abuse, and otherwise benefitted from facilitating this behavior that kept Officer Ross in his role in the facility.

181. These acts constitute civil wrongs inflicted on Plaintiff and are actionable under 18 U.S.C. § 1595.

182. Defendants' conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm and she has a claim for damages for such violations under 18 U.S.C. §§ 1591, 1595.

183. Defendants' conduct warrants the Court's imposition of compensatory and punitive damages against the Defendants.

184. Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

185. WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## DEMAND FOR JURY TRIAL

186. Plaintiffs demand a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff L.J. respectfully requests that judgment be entered against Defendants as follows:

187. An award of compensatory damages for all past and future psychological and personal injuries, included but not limited to severe psychological and emotional injury, physical pain, fear, embarrassment, humiliation, shame, extreme emotional distress, loss of quality of life,

violation of physical integrity, lost earning capacity, economic damages for all medical and counseling expenses, and other harm, in an amount to be determined at trial;

188.     An award of punitive damages in an amount to be determined at trial;

189.     An award of attorney's fees and costs to the fullest extent permitted by law; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4811491.12]

**COMPLAINT**

190.    For such other and further relief as this Court may deem just and proper.

DATED: May 13, 2026                    Respectfully submitted,

/s/ James P. Roberts
**PALMER PERLSTEIN**
James P. Roberts (Attorney-in-charge)
Texas Bar No. 24105721
SDTX Federal No. 3244213
Scott Palmer
Texas Bar No. 00797196
SDTX Federal No. 1751291
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: (214) 987-4100
Fax: (254) 709-7443
James.roberts@palmerperlstein.com
Scott.palmer@palmerperlstein.com

**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**
Kara J. Janssen*
California Bar No. 274762
Emma Stodder*
California Bar No. 362691
Luma Khabbaz*
California Bar No. 351492
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Fax:  (415) 433-7104
kjanssen@rbgg.com
estodder@rbgg.com
lkhabbaz@rbgg.com

*COUNSEL FOR PLAINTIFF*

*Application for admission *pro hac vice*
forthcoming